# UNITED STATES DISTRICT COURT





for the

Central District of California

UNITED STATES OF AMERICA,

v.

JUAN CARLOS MARTINEZ NIETO,

Defendant.

Case No. 5:25-mj-00434

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On June 20, 2025, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Alnahal Jones*

*Complainant's signature*

HSI Special Agent, Alnahl Jones

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     June 24, 2025

*Judge's signature*

City and state:   Riverside, California

Honorable David T. Bristow, U.S. Magistrate Judge

*Printed name and title*

AUSA: Erin C. Kiss

## AFFIDAVIT

I, Alnahl Jones, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against, and an arrest warrant for, JUAN CARLOS MARTINEZ NIETO ("MARTINEZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).

2.    This affidavit is also made in support of an application for a warrant to search a gray Motorola cell phone ("SUBJECT DEVICE 1") and three digital memory cards ("SUBJECT DEVICES 2-4") (collectively, the "SUBJECT DEVICES"), currently in the custody of Homeland Security Investigations ("HSI") in San Bernardino, California, as described more fully in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and it does not purport to set forth all my

knowledge of or investigation into this matter.  Unless specifically noted otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") within the United States Department of Homeland Security.  I have been a SA with HSI since October 2018.  My duties as a HSI SA include the apprehension, or detention of, individuals suspected or convicted of offenses against the laws of the United States, and conducting investigations into violations of federal laws, including those involving immigration, customs, controlled Substances, and other laws relating to the Homeland Security Act of 2002 and the Maritime Drug Law Enforcement Act.  I am presently assigned to the Narcotics Group and am a Task Force Officer ("TFO") with the Inland Narcotics Crackdown Allied Task Force.

6.    I completed the Federal Law Enforcement Training Center Criminal Investigator Training Program in Glynco, Georgia, in May 2018 and the HSI SA Training Program in August 2018.  I have received extensive training in the areas of arrest procedures, the execution of searches and seizures, and various other criminal laws and legal procedures.

7.    During my tenure with HSI, I have used a variety of investigative techniques and resources, including but not limited to such techniques as surveillance, use of confidential sources, search warrants, telephone toll analysis, and wire

intercept communications analysis. I have assisted in handling informants and worked alongside other experienced drug investigators and SAs in criminal and administrative investigations into drug traffickers and money launderers. I have been the case agent and participating agent for international and domestic drug trafficking investigations. I am familiar with the different methods of operations that drug traffickers use, including the distribution, storage, and transportation of drugs and the collection and concealment of drug trafficking proceeds. I have executed arrest and search warrants to seize evidence of violation of federal and state law and to apprehend individuals who have committed such violations. I am familiar with how drug traffickers, exporters, and smugglers use digital devices and international mail to facilitate and conceal their crimes.

7.   I am a federal law enforcement officer as defined in 5 U.S.C. § 8401(17) with added definition and powers derived from 8 U.S.C. § 1357(a)(5)(A) and 19 U.S.C. § 1401(i), an "immigration officer" and a "customs officer," respectively. At the core of these definitions, I am authorized to "execute and serve any order, warrant, subpoenas, summons, or other process issued under the authority of the United States; make an arrest without a warrant for any offense against the United States committed in the officer's presence or for a felony, cognizable under the laws of the United States committed outside the officer's presence if the officer has reasonable grounds to believe that the person to be arrested has committed

or is committing a felony."  In addition, under 19 U.S.C. §
482, as a "customs officer," I am authorized to stop, search,
and examine any vehicle, beast, or person, on which or whom I
suspect there is merchandise, which is subject to duty, or has
been introduced into the United States in any manner contrary
to law.

     8.    Prior to becoming an SA with HSI, I served on active
duty in the United States Navy for 20 years from October 1993
through October 2013.  During my service, I served as a Military
Police Chief Petty Officer and as a Criminal Investigator for
the Criminal Investigations Division, Commander Navy Region
Southwest.  I earned my bachelor's degree in in organizational
leadership and management from Ashford University in 2012, and I
earned a master's degree in business administration from the
University of Phoenix in 2015.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

     7.    On June 20, 2025, U.S. Border Patrol Agents ("BPAs")
stopped MARTINEZ while he was driving on I-15 north in a white
Ford F-250 panel van in Temecula, California.  BPAs saw MARTINEZ
exhibit suspicious behavior and conducted records checks on the
vehicle.  BPAs discovered there was a prior alert for smuggling
placed on the vehicle MARTINEZ was driving.  BPAs subsequently
conducted a traffic stop and found approximately 36 kilograms of
crystal methamphetamine.  In a <u>Mirandized</u> interview, MARTINEZ
gave written and verbal consent to the search of his phone.
MARTINEZ stated that he was paid $3,000 to deliver the van
containing the narcotics to an address in Perris, California.

MARTINEZ admitted he knew the narcotics were in the vehicle and he knew transporting the narcotics was against the law.

8.   Upon MARTINEZ's arrest, agents found the SUBJECT DEVICES on MARTINEZ's person.

### IV. STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Border Patrol Stop**

10.   On June 20, 2025, BPAs assigned to the Newton-Azrak Border Patrol Station ("MUR"), were conducting a targeted enforcement and anti-smuggling operation within the MUR Area of Responsibility.  Agents routinely conduct their enforcement activities along the I-15 corridor.  This area is located approximately 70 miles from the United States/Mexico International Border and is a well-known and documented corridor used by illegal entrants and smugglers to transport illicit cargo north into the interior of the United States.

11.   At that time, BPAs Erik Anderson and Heath Nichol were operating a marked United States Border Patrol ("BP") patrol vehicle and were performing their duty in uniform clearly displaying their status as law enforcement officers.  BPAs Anderson and Nichol are familiar with the appearance and behavior of individuals involved in smuggling undocumented aliens and narcotics into the United States.  BPA Anderson and Nichol received training that includes highway interdictions,

behavioral analysis, and interview techniques, including detecting deceptions and eliciting responses.

12.  On June 20, 2025, at approximately 7:30 p.m., BPA Anderson observed a white Ford E250 panel van bearing Baja Mexico license plate B46-NXU-7 traveling on the I-15 freeway northbound.  MARTINEZ was later identified as the driver.  BPAs saw the van pass their patrol vehicle, which was visible and clearly marked as a BP vehicle.  Upon seeing the BP vehicle, MARTINEZ immediately began to pump the brakes and decrease speed, slowing his speed well below the posted speed limit of 70 miles per hour.  MARTINEZ slowed his vehicle so significantly that he was impeding the flow of traffic and other drivers were changing lanes and go around MARTINEZ.

13.  BPAs maneuvered behind the van and conducted several records checks on the vehicle.  The records revealed the following information:

       a.  The van originally entered the United States by crossing the Otay Mesa Port of Entry ("POE") at approximately 11:20 a.m. the same morning.  Someone other than MARTINEZ drove the van across the POE.[1]  While driving behind the van, BPA Nichol compared a photo of the man who crossed the Otay Mesa POE and could see that it was not the same man as MARTINEZ.

       b.  On April 11, 2025, HSI in Calexico placed an alert on the van for suspicion of outbound currency or weapons smuggling as described further below.

_____

[1] The driver's identity is known to law enforcement and omitted from this affidavit to protect his privacy.

14.  BPAs Anderson and Nichol matched the speed of the van and pulled alongside of the van to observe the actions of the driver.  BPA Anderson and Nichol observed MARTINEZ displaying nervous behaviors, such as scratching his face nervously and avoiding eye contact with the BPAs.

15.  Based upon the BPAs' training and experience, the information obtained from database records checks, and the driving behaviors currently being displayed by MARTINEZ, BPAs Anderson and Nichol initiated a vehicle stop.  BPA Anderson activated the emergency lights and stopped the van near the I-15 Border Patrol checkpoint station in Temecula, California.

16.  BPAs Anderson and Nichol identified MARTINEZ and asked him about his travel itinerary.  MARTINEZ stated he was using the van to transport palletized goods to Perris, California. BPAs Anderson and Nichol could see inside the van and did not observe any palletized goods, and could only see what appeared to be miscellaneous items strewn throughout the inside of the van.  BPAs Anderson and Nichol conducted a records check on MARTINEZ and discovered he had an alert placed on him on May 31, 2025, with a note advising if MARTINEZ was encountered in a vehicle to check it for "liquid meth."

17.  MARTINEZ told agents that he drove the van across the Otay POE earlier that day at approximately 1:00 p.m.; however, earlier records checks already revealed MARTINEZ was not the driver of the van when it crossed the Otay POE at approximately 11:30 a.m. that morning.

**B.    Drug-detection Dog Alerts to the Van**

18.    BPA agents requested the assistance of a trained and certified narcotics detection K-9 to assist at the traffic stop. BPA Erick Emiliano and his canine partner arrived on scene to assist.  BPA Emiliano met with MARTINEZ and explained that his canine is trained to detect concealed humans and odors associated with illegal narcotics.  BPA Emiliano asked MARTINEZ if there were any illegal substances or contraband inside of the van, to which MARTINEZ replied "no."  MARTINEZ was asked if he was responsible for everything in the vehicle, and he replied, "yes I'm driving it."  The narcotics detection canine conducted a sniff of the vehicle, at which point the canine displayed a positive alert on the gas tank of the van.

19.    Following the dog sniff, BPAs Anderson and Nichol detained MARTINEZ and transported him and the van to the Temecula checkpoint to inspect the vehicle.  BPAs ultimately located a total of 72 bundles (weighing 36.15 kilograms) hidden in the gas tank of the van.  MARTINZE was placed under arrest at 8:20 p.m. and transported to the Murrieta BP station for processing.  At the Murrieta station, BPAs seized SUBJECT DEVICE 1 from MARTINEZ's pocket.

**C.    MARTINEZ's Interview**

20.    On June 21, 2025, HSI TFO Carlos Fregoso and I conducted a Mirandized interview of MARTINEZ at the Newton/Azrak Border Patrol Station located in Murrieta, California.  The audio-recorded interview was conducted primarily in Spanish by TFO Fregosa.

a.    At approximately 11:31 p.m., TFO Fregoso read MARTINEZ his Miranda rights.  MARTINEZ stated that he understood his rights and elected to speak with agents without the presence of an attorney.  At approximately 11:32 p.m., MARTINEZ gave agents consent to search SUBJECT DEVICE 1 and signed a consent form.

b.    MARTINEZ stated that he works for a man named "Cesar Sepulveda."  According to MARTINEZ, in the past, Sepulveda directed MARTINEZ to gather secondhand materials for sale and deliver them at various locations.  MARTINEZ claimed that Sepulveda would compensate him $250 per trip in addition to other work expenses such as gasoline.

c.    MARTINEZ admitted that on June 20, 2025, Sepulveda directed him to deliver an unknown quantity of narcotics to an address located in Perris, California.  MARTINEZ advised that once he arrived at the address, he was supposed to drop off the vehicle and leave.  Once the vehicle was emptied by an unknown person, MARTINEZ would receive a phone call instructing him to pick up the vehicle.

d.    MARTINEZ stated that he knew that his actions were in violation of the law; however, MARTINEZ further stated that his brother had recently passed away and that he needed money.  MARTINEZ stated that he was going to be compensated $3,000 if he successfully delivered the narcotics.  At approximately 11:56 p.m., the interview was concluded.  MARTINEZ was subsequently transported to the Southwest Detention Facility in Murrieta, CA on June 21, 2025.  During the booking process,

SUBJECT DEVICES 2 through 4 were found hidden inside MARTINEZ's wallet and subsequently seized by agents.

### D. The Van Previously Involved in Smuggling Methamphetamine

21. On June 21, 2025, I contacted HSI SA Adam Green, who created the alert for the van. SA Green advised that during a previous investigation involving a subject who was stopped at the Calexico POE for smuggling a large quantity of methamphetamine, a photo of the van was discovered in the subject's phone, and the subject was directed to pick up the van from an address and drive it south of the border in exchange for compensation.

### E. Drug Test

22. BPAs tested one of the 72 bundles of suspected methamphetamine that was discovered in the van's gas tank using the TruNarc testing unit. The substance tested presumptively positive for methamphetamine. Approximately two kilograms of the suspected methamphetamine has been sent to a Drug Enforcement Administration laboratory for confirmatory testing.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

11

e.    I know that narcotics traffickers have been known to utilize multiple "burner" cell phones and switch them up often to avoid detection by the police.  Often, they keep the memory cards from the phones and buy new ones with a new phone number and have been known to activate the new sim/memory card on the same device.  Doing this creates an entire new SIM number and phone number for the user.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

24.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

      e.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      f.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VII. <u>CONCLUSION</u>

27.  For all the reasons described above, there is probable cause to believe that MARTINEZ has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
Telephone on this <u>24th</u> day of
June 2025.

_____
HON. DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE